FILED
2020 Oct-21  PM 12:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| CODY COUMES, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION |
| ANDREW SAUL, | ) | NO. 2:19-CV-00757-KOB |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On December 27, 2017, the claimant, Cody Coumes, applied for disability insurance benefits under Title II of the Social Security Act. (R.16). The claimant alleged disability beginning May 2, 2016, because of ulcerative colitis, adjustment disorder with depression, anxiety and insomnia, lower back pain, knee pain, and shoulder pain. (R. 77). The Commissioner denied the claimant's application for disability insurance benefits on June 12, 2018. (R. 16). The claimant filed for a hearing before an Administrative Law Judge, and the ALJ held the hearing November 14, 2018. (R. 16).

On December 12, 2018, the ALJ denied the claimant's application, finding that the claimant was not disabled during the relevant period and, therefore, was ineligible for social security benefits. (R.118). Plaintiff then requested a review of the decision, and on April 18, 2019, the Appeals Council denied review. (R. 148). Accordingly, the ALJ decision became the final decision of the Commissioner of the Social Security Administration.  The claimant has

exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

Whether substantial evidence supports the ALJ's Residual Functional Capacity (RFC) determination that did not include a limitation for frequent bathroom breaks or inability to concentrate caused by the claimant's ulcerative colitis.

## STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

This court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's RFC, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or

decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a listing and is qualified for Social Security disability benefits is a question reserved for the ALJ. The court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must look to those parts of the record that support the ALJ's decision, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### III. LEGAL STANDARD

A claimant's RFC is the work that an individual "is still able to do despite the limitations caused by his . . . impairments." *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004) (citing 20 C.F.R. § 404.1545(a)). The ALJ must first assess the claimant's functional limitations and restrictions and then express his functional limitations in terms of exertional levels. *See* SSR 96-8P; *see also Freeman v. Barnhart,* 220 F. App'x 957, 959–60 (11th Cir. 2007).

The ALJ must consider all of the relevant evidence in assessing the claimant's functional limitations, including:

> medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.

S.S.R. 96–8p at *4–*5.  In making his RFC assessment, the ALJ must thoroughly discuss and analyze all objective medical evidence and other evidence of record, including the claimant's complaints of pain and other symptoms; give a logical explanation of the effects of the claimant's symptoms, including pain, on the claimant's ability to work; and discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

## IV. FACTS

The claimant was 30 years old at the time of the ALJ's final decision. In 2010, the claimant received a digital art and new media Bachelor's degree. He served in the Navy from 2012 until 2018 when he received a medical discharge because his medical conditions disqualified him from performing his flight duties; he has a 70% disability rating from the VA for his anxiety, 30% for his ulcerative colitis, 10% for his lumbar strain, and 10% for his cervical strain.[1] (R. 45, 170-179).  In June 2018, the claimant began taking classes at Samford University for his MBA, including human resources and accounting for managers. (R. 44).

The claimant has past relevant work experience as a lifeguard, waiter, logistics specialist, and Navy rescue swimmer. (R. 97-98). The claimant alleges disability as of May 2, 2016, because of ulcerative colitis; adjustment disorder with depression, anxiety, and insomnia; lower back pain; knee pain; and shoulder pain. (R. 88-89).

*Physical and Mental Impairments*

On March 16, 2015, the claimant admitted himself to the emergency room at Naval Medical Center in San Diego (NMC) for lower back pains. The claimant reported the onset of

---

[1]  For claims filed after March 27, 2017, an ALJ is no longer required to provide analysis in his decision about a decision made by any other governmental agency about whether the claimant is disabled or entitled to benefits.  *See* 20 C.F.R. § 404.1504.  But the ALJ should "consider all of the supporting evidence underlying the other governmental agency. . . ." decision  *Id.*

lower pain started after working out at the gym. The emergency room doctor, Dr. Tracy Nelson, noted the claimant's back had no acute fractures or spondylolisthesis – the displacement of one spinal vertebra compared to another. Dr. Nelson opined that the claimant's pain was likely because of mild degenerative changes at S1-2 for which she prescribed five milligrams of Diazepam and 500 milligrams Naprozen. (R. 608).

On May 18, 2015, the claimant sought treatment from Dr. Timothy Lynch at Coronado Naval Base Clinic (NBHC) for his lower back pain. The claimant reported he felt a snap and sharp pain after squatting 200 pounds of weight. He denied numbness, tingling, or difficulty urinating. The claimant reportedly had lower back pain a month before while onboard the naval ship; however, he stated he was asymptomatic until the gym accident. Dr. Lynch noted that the claimant had "no radicular symptoms or red flags but patient is demanding an MRI." Dr. Lynch found no reason to order an MRI and recommended physical therapy and chiropractic treatment. (R. 501-505).

On May 19, 2015, on Dr. Lynch's referral the claimant attended a physical therapy appointment at NBHC with physical therapist Robert Worms. The physical therapist recommended three to four weeks of physical therapy to increase range of motion and stabilization of the claimant's back. On May 28, 2015, the claimant returned to NBHC for a physical therapy session for his lower back; the physical therapist noted that the claimant had "overall less intense [lower back pain], but still constant ache in central lumbar spine." Additionally, the claimant reported a four out of ten pain and denied spasms in his lower spine. On June 1, 2015, the claimant attended a third physical therapy session for his lower back pain. The claimant reported he felt better and could perform his home exercise program with no complaints. (R. 492-500).

On July 22, 2015, the claimant sought treatment at the NMC for abdominal pain and bloody stool. Dr. McNamara administered a rectal exam and found no fissure or obvious hemorrhoids on examination, and noted he had likely internal hemorrhoids. The doctor discussed adding dietary fiber to the claimant's diet as well as H20 supplementation. On August 22, 2015, while onboard the USS John C. Stennis Naval Ship, the claimant sought medical treatment for bloody stool and rectal bleeding. Dr. Donald Lucas, the claimant's ship surgeon, attributed the claimant's symptoms to internal hemorrhoids and prescribed fiber supplements. (R. 486-489).

Six months later, on January 4, 2016, Dr. Adam Danielson treated the claimant for reoccurring bloody stools. Dr. Danielson requested a gastroenterology consult for further evaluation. On January 12, 2016, the claimant began seeing Dr. Edward Stickle, a gastroenterology specialist, at NMC. Dr. Stickle's records from that visit indicate that the claimant likely had internal hemorrhoids, but a flexible sigmoidoscopy and colonoscopy would be necessary to rule out other diagnoses. On January 14, 2016, Dr. Stickle performed a colonoscopy on the claimant for biopsy testing. (R. 482, 484, 606).

Dr. Stickle then diagnosed the claimant with ulcerative proctitis on January 19, 2016, and placed the claimant on Lialda 2.4 milligrams daily, Rowasa enema for inflammation of the colon, and Canasa suppository to treat inflammation of the colon. Dr. Stickle cleared the claimant for deployment but suggested that, if symptoms returned, the claimant might need emergency evacuation for further treatment. (R. 477-479).

On May 31, 2016, while deployed onboard the USS John C. Stennis Naval Ship, the claimant again sought treatment from Dr. Lucas for increased bowel movements, pain, weight loss, and anemia. Dr. Lucas examined the claimant and determined that he was in a severe ulcerative colitis flare-up. Dr. Lucas recommended emergency evacuation after two to three days

6

of IV and oral steroids, a clear liquid diet, and enemas. On June 1, 2016, the next day, Dr. Lucas followed-up with the claimant and performed a colonoscopy to remove pseudopolyps for biopsy testing. Dr. Lucas determined that the claimant had ulcerative colitis because the inflammation in the colon was continuous. (R. 472-476).

After the claimant's evacuation from the naval ship, he received follow-up care at NMC's ER from Dr. Stickle and was admitted on June 7, 2016. Dr. Stickle diagnosed the claimant with ulcerative colitis, unspecified, without complications. Then, on June 8, 2016, x-ray examinations, CT scans, and ultrasounds of the claimant's abdomen and pelvis ruled out obstructions of the small bowl but found evidence of pancolitis and pseudopolyps. (469-471, 603-605.)

Subsequently, on June 13, 2016, Dr. Goldy Garcia discharged the claimant with instructions to start Prednisone 40 milligrams daily, to follow-up with Dr. Stickle within one week, to start Lialda at a higher dose of 4.8 milligrams daily, to continue Canasa suppositories, and to start weekly vitamin D and calcium supplements. (R. 463-464.)

On June 16, 2016, the claimant returned to NMC for two appointments regarding his ulcerative colitis. The first appointment that day was with Dr. Dennis Jepsen for the claimant's initial primary care intake evaluation. Dr. Jepsen noted the claimant's present illness symptoms as fatigue; occasional night sweats; weight loss; fast heart rate; average of three "soft serve" stools per day with occasional streaks of blood; bilateral knee joint pain; and mild anxiety. Dr. Jepsen noted the claimant's current medications were 40 milligrams of Prednisone; 50,000 units of Vitamin D a week; 600 to 400 milligrams of Caltrate calcium supplements daily; 20 milligrams of Prilosec; and 4.8 grams of Lialda daily; 1000 milligram of Canasa suppository daily; and probiotics.  The claimant's second appointment with Dr. Stickle showed that the claimant's ulcerative colitis was "doing well, clinically trending towards remission."

Additionally, Dr. Stickle continued to prescribe the same medication regiment for the next two to three weeks. (R. 453-461).

Then, on July 7, 2016, the claimant returned to see Dr. Stickle for a follow-up appointment. The claimant reported no abdominal pain, diarrhea, fever, and chills; a gain of 25 pounds since discharge; some weakness, fatigue, and acne from the steroids; and fatigue that progressively got better. Dr. Stickle noted that the claimant is "almost in remission except for soft stool," and his ulcerative colitis disease was responding to medication and was improving. Dr. Stickle indicated that the claimant was presently taking 40 milligrams of oral steroids; however the doctor recommended the dosage decrease by five milligrams each week for the next two months. On July 7, 2016, the claimant attended a follow-up appointment with his primary care physician Dr. Jepsen, who noted the same findings as Dr. Stickle. (R. 435-447).

Next, the claimant returned, on August 3, 2016, to NMC's ER with abdominal pain, body aches, and fever. The treating physician, Dr. Chelsea Robertson, noted that her physical examination of the claimant was not consistent with an ulcerative colitis flare-up. (R. 430). The next day, August 4, 2016, Dr. Jepsen followed-up with the claimant for his ulcerative colitis; he noted that the claimant's pain had subsided, and symptoms were inconsistent with an ulcerative colitis flare-up. Additionally, the claimant reported being anxious. So, Dr. Jepsen recommended a mental health consultation for the claimant. (R. 425-429).

On August 17, 2016, Dr. Stickle talked to the claimant over the phone. The claimant reported an episode of rectal bleeding and one to two well-formed stools. Dr. Stickle's recommended the claimant continue taking 10 milligrams a day of Prednisone. (R. 421).

The claimant returned for a follow-up appointment with Dr. Stickle on August 23, 2016. Dr. Stickle's records indicated that the claimant had been on 10 milligrams a day of Prednisone;

had one to two well-formed bowel movements daily; rarely has cramps; and is still gaining weight. Also, Dr. Stickle determined that the claimant is "in tenuous clinical remission…." Dr. Stickle also recommended continuing his steroid taper and noted the claimant had no further problems; tolerates the mesalamine monotherapy; and can return to full duty. (R. 418-420).

On September 6, 2016, on Dr. Jepsen's referral, the claimant attended a mental health initial evaluation with a psychologist, Dr. Nancy Kim, at NMC. The claimant disclosed to Dr. Kim that he was experiencing anxiousness associated with adjustment to his illness and the associated stressors. Dr. Kim recommended bi-monthly cognitive-behavioral psychotherapy to target anxious symptoms, grief and loss issues, adjustment to illness, and to enhance adaptive coping skills. Dr. Kim noted the claimant was mildly anxious within the constricted range; was appropriately groomed and clad in flight suit; cooperative and self-disclosing, with good eye contact; was linear, logical, and future oriented; and had fair memory and concentration. Furthermore, Dr. Kim qualified the claimant's mental health as low risk, not suicidal, homicidal or gravely impaired, and not in need of acute psychiatric hospitalization. Dr. Kim cleared the claimant for full duty, including flight duty (R. 413-417).

A month later, on September 20, 2016, the claimant returned to NMC for a follow-up appointment for ulcerative colitis. Dr. Joseph Cheatham noted that the claimant takes a steroid taper; takes 4.8 grams of Lialda a day; has soft but formed bowel movements, one to two a day; and has no abdominal cramping, blood in stools, fevers/chills, joint swelling, or pain. Dr. Cheatham further noted, "[t]he patient currently is in clinical remission." (R. 408-409).

The claimant returned to NMC on September 26, 2016 for a follow-up appointment with Dr. Jepsen. Dr. Jepsen noted that the claimant is "doing well, tapering off Prednisone; weight stable, no GI bleeding; good energy level; no fatigue." After this appointment, the claimant saw

Dr. Kim for cognitive behavioral therapy. Dr. Kim's records for that day reiterate the same findings as the September 6, 2016 appointment. (R.403-405, 470).

Several days later, on October 3, 2016, the claimant had a follow-up appointment with Dr. Adam Danielson for ulcerative colitis. Dr. Danielson noted, "[n]o significant complaints today, reports having fairly normal [bowel movements] with [the] absence of abdominal pain." Dr. Danielson further noted that the claimant was on his last tapering dose of Prednisone at 2.5 milligrams daily. (R. 402).

Again, on October 14, 2016, the claimant saw Dr. Stickle at NMC for his ulcerative colitis. Dr. Stickle noted that the claimant has completed the steroid taper; has one to two well-formed bowel movements daily; has started to exercise again, but still feels fatigued; has no pain with defecation; has occasional streaks of blood when wiping; has no sign of rectal bleeding; and has an adequate appetite. Lastly, Dr. Stickle noted "no significant change to plan," and the claimant is "[o]therwise, currently fit for full duty." (R. 399-400.)

On October 24, 2016, the claimant sought physical therapy treatment at NBHC for lower back pain and tightness. The physical therapist Robert Worms diagnosed the claimant with acute mechanical lower back pain, also known as lumbago. The physical therapist recommended that the claimant attend physical therapy sessions for one to two days a week for four weeks. The claimant attended physical therapy sessions until November 30, 2016. Over that period, the claimant asserted, "therapy has been decreasing lower back pain." (R. 384-397).

On December 8, 2016, at NMC, the claimant saw Dr. Stickle for his ulcerative colitis. The claimant reported having one to two regular bowel movements daily without bleeding and pain. The claimant inquired about treatment options in light of his recent colonoscopy finding of mild active colitis and medication risks. Dr. Stickle recommended no further therapy because the

10

claimant was in remission on the Lialda monotherapy and the claimant could return to full duty. According to Dr. Stickle's notes, monthly appointments were no longer necessary because the claimant was in remission. (R. 380-383).

At NMC, on December 28, 2016, the claimant attended a surgical consultation with Dr. Amanda Cimist, who discussed at length with the claimant the surgery for ulcerative colitis. Dr. Cimist noted no clinical indications for surgical intervention and actively encouraged the claimant to continue his maximal medical management as long as his symptoms were well-controlled.  (R. 374-379).

On April 10, 2017, the claimant returned to NBHC to see Dr. Adam Danielson for his yearly physical. The claimant reported no significant symptoms related to his ulcerative colitis and stability on his monotherapy dose with Lialda. (R. 369-370).

Two months later, on June 5, 2017, the claimant returned to NMC for a follow-up appointment for his ulcerative colitis with Dr. Leonard Philo, a gastroenterologist.  The claimant reported having one to two bowel movements a day.  Dr. Philo reported that the claimant is clinically in remission; his symptoms were unchanged; and he should continue Lialda and return to full duty. (R. 362-366).

From July 28, 2017 to November 20, 2017, after a brief hiatus, the claimant returned to regularly scheduled cognitive behavioral therapy sessions with his psychologist Dr. Nancy Kim. Dr. Kim noted that the claimant did not return to therapy for several months because he did not complete cognitive behavioral therapy homework. Dr. Kim reported the same findings as to her initial evaluation on September 9, 2016. However, the claimant reported an increase in anxiousness over the previous several months; stress about occupational uncertainty; decreased

interest in usual activities; trouble sleeping; and catastrophic thinking tendencies. (R. 359-361; 335-344; 310-317).

On February 22, 2018, the claimant completed a Function Report at the Social Security Administration's request. The claimant stated that the "unstable nature of ulcerative colitis" interferes with his ability to work without proper facilities.  He also listed other ailments such as cervical spine pain, shoulder pain, knee pain, anxiety, depression, and insomnia as reasons why he is unable to work a full forty hours a week.  (R. 229).

His typical day consist of cooking breakfast for his family; researching about school and continuing education; finishing required paperwork for the Navy; reading; working on artwork and designs for his portfolio; taking care of his pregnant wife and child; and looking for places to live after his employment with the Navy ends. He also explained that his injuries, impairment, and conditions cause difficulty dressing, feeding himself, and using the toilet. (R. 230).

The claimant also reported that his wife often has to remind him to shave regularly and take his medication Lialda. When he prepares his meals, he makes "sandwiches, chicken, and cereal" on a weekly basis. He also reports he spends ten to thirty minutes making his meals. The claimant stated that he cooks less frequently now because he has to avoid upsetting his colitis. The claimant can "clean, do dishes, and mild repairs if needed" on a weekly basis for thirty to sixty minutes. Furthermore, the claimant reported that his wife has to encourage him to do the laundry and dishes. (R. 231).

The claimant stated he goes outside "sometimes more than others, daily to help [him] think." He also reported that on a weekly basis he drives, shops in stores, shops by phone, and shops by computer for groceries, clothes and baby needs. The claimant also noted that he can

manage money by paying bills, by counting change, by handling his savings account, and by using checkbook/money order. (R. 232).

The claimant reported his hobbies and interests include "reading and creating art/digital designs for people and [himself]," often three to five times a week. His social activities include visiting, dining, shopping, and talking to family and friends once a week, and going to church weekly. His condition causes him to not reach out to friends and family as often as he used to because of loss of interest and his adjustment disorder. (R. 233-34).

The claimant stated that his illness, injuries, or conditions affect his ability to lift/squat greater than 50-100 pounds, reach, sit, bend, hear, remember, complete tasks, concentrate, understand, and follow instructions. He stated that he can walk up to a mile before he needs to rest and has to rest for a period of fifteen to thirty minutes before he can start walking again. He reported he often has to go back and read instructions to make sure he is doing the task correctly. Additionally, he noted following written instructions is easier than oral instructions. He stated he has trouble getting along with authority figures; has trouble handling stress, and "get[s] triggered and edgy"; has trouble with changes in routine depending on the routine; and he has "fear of not providing for [his] family, fear of failure, [and] fear of healthy wife [and] baby, and fear of starting over." Lastly, the claimant stated that the Lialda/masaline causes stomach cramps, gas, fatigue, and bloating. (R. 234-256).

On March 28, 2018, at the request of the Social Security Administration, Dr. Timothy Honigman completed an RFC assessment of the claimant by reviewing his records. Dr. Honigman found that the claimant could occasionally lift, carry, and pull 50 pounds; frequently lift, carry, and pull 25 pounds; could stand and walk for six to eight hours; could sit six to eight hours; could perform unlimited pushing and pulling; had no postural limitation; had no

manipulative limitations; had no visual restrictions; had no communicative restrictions; and had no environmental limitations. Dr. Honigman concluded that the claimant could perform work at the medium exertion level and was not disabled. (R. 82-86.)

On March 28, 2018, Psychologist Dr. Robert Clanton, PhD performed a mental examination of the claimant at the request of the Social Security Administration and found that the claimant is not significantly limited in remembering locations and work-like procedures; not significantly limited in understanding and remembering very short and simple instructions; and moderately limited in understanding and remembering detailed instructions. (R. 83-84).

Dr. Clanton further found the claimant is not significantly limited in concentration and persistence; moderately limited in carrying out detailed instructions; moderately limited in maintaining attention and concentration for extended periods; not significantly limited in performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; not significantly limited in sustaining an ordinary routine without special supervision; no significantly limited ability to work in coordination with or in proximity to others without being distracted by them; no significantly limited ability to make simple work-related decisions; no significantly limited ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number or length of rest periods; no limitations of social interactions; and no limitations in adaptation. Dr. Clanton concluded the claimant was not disabled. (R. 84).

On May 1, 2018, after moving to the Birmingham area, the claimant sought treatment at Birmingham VA Medical Center for lower back pain, left shoulder burning, focus issues, depression, and management for ulcerative colitis.  Primary care physician Dr. Kalim Ali treated the claimant and requested various consultations for physical therapy, psychiatry, and

gastroenterology. An x-ray of the claimant's spine showed mild degenerative changes in the spine. Additionally, Dionne Miles, a physical therapist, examined the claimant later that day and determined the claimant had lower back pain. Ms. Miles recommended an at-home management training and a TENS unit for pain. (R. 634, 715).

Subsequently, on May 8, 2018, the Social Security Administration requested that Dr. Krishna Reddy complete an additional physical RFC assessment of the claimant by reviewing the claimant's records. Dr. Reddy's findings mirrored Dr. Honigman's findings, plus contained additional findings that the claimant could frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance; frequently stoop; frequently kneel; frequently crouch; and frequently crawl. Additionally, Dr. Reddy found that the claimant should avoid concentrated exposure to extreme cold and heat; avoid all exposure hazards; and never work at unprotected heights or with hazardous machinery. (R. 111-112).

The Social Security Administration also requested a second mental assessment regarding the claimant's application for disability benefits. On May 8, 2018, Dr. Robert Estock, MD noted the same findings as psychologist Dr. Clanton, but added that the claimant was moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest period; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and in responding appropriately to change in the work setting. (R. 112-114).

On May 9, 2018, the claimant attended a mental health consultation with Nurse Practitioner Lauren Roberts at the VA. The claimant reported focus issues, anxiety, depression, and problems sleeping. Ms. Roberts noted adequate grooming and hygiene; good eye contact;

cooperation; depressed mood; thought process as logical, organized, and goal oriented; no suicidal ideation; no homicidal ideation; and no overt psychosis. NP Roberts's notes indicated that the claimant has an adjustment disorder with mixed anxiety and depressed mood. NP Roberts recommended psychotherapy and drug medication such as antidepressant and melatonin for insomnia. However, the claimant declined medication management. (R. 636-644).

Upon Dr. Ali's referral, on May 29, 2018, the claimant attended a gastroenterology consultation with Dr. Peter Mannon. The claimant reported one to three bowel movements a day; soft but formed stools; some urgency that causes him to use the toilet several times a day where he produced no stool or some yellow to pink mucoid material; and trace blood in 50% of stools but no accidental defecations. Dr. Mannon recommended that the claimant continue Lialda, have a colonoscopy in two weeks, and possibly use of biologics such as Humira that reduces the effects of a substance in the body that can cause inflammation. (R. 651-657).

On June 14, 2018, Dr. Mannon performed a colonoscopy on the claimant that revealed ulcers and scare tissue in the colon, indicating moderately severe ulcerative colitis in the rectum. Dr. Mannon recommended that he follow-up with his physician after the biopsy results and repeat a colonoscopy in five years. The claimant's June 18, 2018 biopsy results indicated chronic active colitis in the cecum; chronic inactive colitis in the ascending colon; chronic active colitis in the polypectomy; chronic active colitis in the transverse colon; chronic inactive colitis in the descending colon; and chronic active colitis in the rectum. (R. 707).

On August 28, 2018, the claimant sought treatment at the VA's gastroenterology clinic, but later admitted to the hospital for abdominal pain, hematochezia, and diarrhea. A CT Scan of the claimant's abdomen and pelvis indicated wall thickening and inflammatory changes consistent with active inflammatory ulcerative colitis. (R. 722). Additionally, the attending

16

physician, Dr. Adam Edward, noted concerns for an acute flare of ulcerative proctitis versus now left-side colitis based on CT scan and the claimant's last colonoscopy. Dr. Edward's discharged the claimant on September 1, 2018 and prescribed oral steroids. (R. 751).

However, the claimant was readmitted on September 6, 2018, when the oral steroids failed, and symptoms persisted. The discharge summary denoted the claimant's condition "as an acute flare of ulcerative colitis with isolated proctitis." The doctors initially treated the claimant with intravenous steroids, enemas, anti-inflammatory drugs, and anti-cramping drugs. On September 9th, the claimant transitioned to 40 milligrams of oral Prednisone, but the frequency of his bowel movements worsened. On September 10th, the doctors increased the claimant's Prednisone to 60 milligrams, with improvement in bowel movement frequency, bleeding, and volume. Additionally, the claimant started Inflectra infusions, Benadryl, Tylenol, as well as Prophylaxis for chronic steroid use with 40 milligrams of Protonix and double strength Bactrim. (R. 764-765).

Lastly, on September 27, 2018, on Dr. Kalim's referral, the claimant underwent an MRI of his lumbar spine, which showed moderate disc protrusion and mild facet hypertrophy, resulting in mild spinal canal stenosis at L1-L2 and L2-L3; mild spinal canal stenosis at L3-L4 and L4-L5; small posterior disc tear, mild facet hypertrophy, and moderate spinal canal stenois with no evidence of root compression at L5-L6; and presence of 5 lumbar-type vertebrae and one transitional vertebrae, labeled as L6.[2] The MRI report indicates possible treatments for the claimant's diagnosis such as physical therapy to interventional pain blocks, and even perhaps surgical evaluation. (R. 718-720).

---

[2]  This finding shows a lumbosacral transitional vertebrae, a "congenital spinal anomaly" that occurs when "S1 separates entirely from the sacrum," and "6 lumbar vertebrae exist." *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4603258/.

*The ALJ Hearing*

On November 14, 2018, the ALJ held a hearing at which the claimant and vocational expert Ms. Howell testified. The claimant testified that he received a bachelor's degree in 2010 and enrolled at Samford University for a Master's degree after his medical discharge from the Navy. The claimant stated he is taking two classes, one online and another on campus from 6:00 pm to 8:00 pm on Thursdays. Additionally, the claimant said he was in the military from June 4, 2012, until March 28, 2018, receiving an honorable discharge for medical retirement. The claimant testified that he has a valid driver's license and drives two to three times a week.  On these days, he stated he drives "mostly [to the] VA for appointments, school, or to run errands. We go to the grocery."  (R. 44-46).

Next, the claimant testified that he has not worked since his military discharge. The claimant further testified about his past civilian work as a waiter, lifeguard, cashier, student assistant at a college, and warehouse worker for Walmart. The claimant stated he receives $2000 a month in VA disability benefits as income with a rating of 90 percent service-connected disability. In addition to his $2000 for disability, the claimant stated he receives G.I. bill benefits every month and $1400 for going to school. The claimant testified that he sometimes does graphic design projects for "extra grocery at the end of the month...." Lastly, the claimant testified that his wife contributes no additional income to the household. (R. 46-49).

When asked why he believes he is disabled and unable to work, the claimant testified "my—the ulcerative colitis...diagnosed in the navy. It's caused me to lose my career in the navy, prevent me from becoming an officer in the navy." Because his condition is "unpredictable and there is no cure," he was forced into early retirement. Furthermore, the claimant said his

ulcerative colitis "has only gotten worse and the amount of medications I'm [getting] to—even to keep stable is—they just have a lot of side effects." (R. 49).

The claimant listed his symptoms from the colitis as "severe abdominal pain, almost constant trips to the bathroom…20, or more bathroom visits a day." He testified that up until September 2018, he needed restroom breaks "20 times a day."  He has "intense bleeding" of his rectum, bleeding every day when he is in a flare. During a flare, the claimant testified that he spends "anywhere from ten to 30 minutes" in the bathroom each time.  (R. 51-52, 73).

Next, the claimant testified that the frequency of 20 or more bathroom visits a day was not current because he is "on a power infusion medication" and the frequency of his bowel movements has "slowly gotten better" at the "end of September" 2018.  The claimant indicated his frequency is currently "two to three times a day." Regarding his abdominal pain, the claimant testified, "[i]t is always there." (R. 51-52).

Additionally, the claimant further clarified that "all the symptoms that [he] mentioned before" are the symptoms he experiences during a flare-up, but "they kick into high gear." The claimant testified that his first flare started in June 2015 and lasted a whole year. Then, the claimant stated his second flare was from March 2018 to September 2018. The second flare-up was also his last flare-up. As to what triggers his flare-ups, the claimant testified "a large amount of stress." (R. 52-54).

The claimant testified that he took the following medications: 15 milligrams of Prednisone, Bupropion for depression, Mesalamine, and Influxor infusions. The claimant stated that doctors tapered down his Prednisone to 15 milligrams a day, and he receives the Influxor infusions every eight weeks. As to the side effect of these medications, the claimant testified to mood swings, intense irritability, insomnia, acne, and joint pain. (R. 54-55).

19

The claimant stated the Bupropion for depression helps him focus on his schoolwork. The claimant further testified that his depression would not keep him from working if that were the only thing going on with him. Despite his medical records indicating the claimant has depression, the claimant stated he is unsure if he has depression. The claimant stated that he missed school because he was in the hospital, but he is making "A's and B's" in his classes. (R. 56).

Subsequently, the claimant described his typical day of waking up at 6:30 or 7:00 am; making breakfast for himself and his two children; taking care of the children until his wife wakes ups; working on homework until lunch; hanging out with the kids; working on a graphic design project if he has one; and getting ready for bed around 8:30 or 9:00 pm.

The claimant also stated that he suffers from back pain. The claimant testified that his MRI showed three bulging discs and a torn discus. He stated that VA is sending him to a pain clinic for spinal blocks in the next few months. The claimant stated he has trouble sitting, driving, bending, standing, and carrying 20 or more pounds. Bending straight at the waist is the worst pain he experiences. Lastly, the claimant stated that he experiences pain in his shoulder, especially when he is working on the computer. (R. 57-58).

The ALJ then examined the claimant's wife, Kelly Coumes. Mrs. Coumes testified to the claimant's physical and mental health conditions.  She stated she has watched her husband have accidents on himself; that he rarely wants to leave the house for fear of having an accident or bleeds; and that he is always exhausted mentally and physically. Mrs. Coumes stated that the claimant suffers from severe depression, primarily because of the medications he takes; he is angry and, on occasion, has thrown things out of anger; and she could tell by looking at him that he feels "he's lost his life, his purpose…." Mrs. Coumes also stated that the claimant has trouble

with his back. She is most concerned about the claimant's mental health. She said that he has had "several mental break downs," breaking chairs and doors. (R. 62-65).

The ALJ posed several hypothetical questions to the vocational expert Ms. Marissa Howell. The ALJ asked Ms. Howell to assume a hypothetical individual who is younger; has a bachelor's degree; has the same RFC as the claimant; can occasionally stoop and crouch; cannot climb and drive; can occasionally have contact with the general public, coworkers, and supervisors; and cannot perform work requiring meeting production goals or quotas. (R. 66-67).

The ALJ then asked, setting aside past relevant work, whether a person with these limitations could perform medium work. Ms. Howell testified that the hypothetical person could perform medium, unskilled work as a cardboard box maker, with 9,560 in Alabama and 693,407 jobs nationally; a dishwasher, with 5,070 in Alabama, 559,886 jobs nationally; a stems tier[3], with 8,320 jobs statewide; and 672,020 jobs nationally. (R. 68).

The ALJ then asked whether a person with these limitations could perform light work as well. Ms. Howell testified that the hypothetical person could perform light, unskilled work as a garment sorter, with 1,844 jobs in Alabama and 251,670 jobs nationally; as a ticketer/tagger, with 23,310 jobs in Alabama and 2,016,340 jobs nationally; as a furniture distributor, with 1,050 jobs in Alabama and 38,830 jobs in the national economy. (R. 69).

The ALJ then asked whether any sedentary work opportunities existed for a person with these limitations. Mrs. Howell testified that the hypothetical person could perform sedentary, unskilled work as a dowel inspector, with 1,350 jobs in Alabama and 518,950 jobs nationally; as

---

[3] A stems tier ties bunches of forest greenery together for eventual sale to consumer by placing greenery in pressure clamp and presses pedal to hold bunches together while tying. See e.g., https://occupationalinfo.org/92/920687094.html

a ceramic title examiner, with 10,260 jobs in Alabama and 518,250 jobs nationally; and as a lens inserter, with 1,980 jobs in Alabama and 251,670 nationally. (R. 69).

The ALJ then asked whether a person with these limitations could perform the same past relevant work as the claimant. Mrs. Howell testified that a person with these limitations could not perform the same past relevant work as the claimant. (R. 70).

Next, the ALJ changed one of the limitations of the hypothetical, from occasional contact with the general public, coworkers, and supervisors to no contact at all. Ms. Howell testified that a person with this limitation would have no job opportunities. (R. 70).

The ALJ asked how long an individual would be required to sit at one time to do sedentary work. Ms. Howell answered that an individual performing sedentary work is expected to sit anywhere from two thirds to eight hours of the workday. Ms. Howell testified that a person would be required to sit at least two hours at one time. Ms. Howell also stated that an individual would be required to stand or walk for two hours of the day for light work and up to six hours of the day for medium jobs. (R. 70-71).

The ALJ then added several limitations to the hypothetical, specifically no left upper extremity pushing or pulling or overhead reaching. Ms. Howell testified that all medium, light, and sedentary work would be eliminated. Next, the ALJ asked what the attendance expectations would be for the type of jobs Ms. Howell previously listed. Ms. Howell stated that a person could be absent for two days per month, and if absences occurred consecutively for three months in a row, then employment in the competitive national economy would not continue. (R. 71-72).

The ALJ asked how much time, if any, could an individual with the same limitations as the claimant, be off-task during the typical eight-hour workday and still perform the types of duties consistent with the jobs Ms. Howell identified. Ms. Howell stated that an individual with

the same limitations as the claimant could be off task up to 20 percent out of an eight workday in addition to regularly scheduled breaks. (R. 72-73).

Next, the ALJ posed an additional hypothetical asking whether an individual could be off task and away from their workstation upwards of 20 times during an eight-hour workday.  The ALJ added the specification that the individual would be away from their station at most 30 minutes at a time. Ms. Howe stated that this time off task and away from the workstation would not be acceptable for continued employment.  (R. 73-74).

The ALJ asked next whether an individual could be away from their workstation on two-thirty-minute occasions each day. Ms. Howe testified this limitation would not be acceptable for continued employment because, at most, an individual can be off-task 45 minutes of the workday. (R. 74).

*The ALJ Decision*

On December 12, 2018, the ALJ found that the claimant was not disabled, within the meaning of the Social Security Act, from May 2, 2016, through the date of his decision. The ALJ found that the claimant has not engaged in substantial gainful activity since May 2, 2016, the alleged onset date. (R. 30).

Additionally, the ALJ stated that the claimant had severe impairments of pancolonic ulcerative colitis, history of mild degenerative disc disease of the lumbar spine, adjustment disorder with depression, and anxiety. (R. 18-19).

The ALJ then found that the claimant's impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Explicitly, the ALJ stated no examining or treating medical source has

reported that the claimant has an impairment or combination of impairments that meets or equals the criteria of a listed impairment. (R. 19).

The ALJ then considered the claimant's mental impairments, both individually and in combination with his physical impairment, and found that the mental impairments also did not meet the severity of any listing. (R. 20).

The ALJ stated that the claimant had only a moderate limitation in understanding, remembering, or applying information. Specifically, the ALJ found that the claimant could drive, leave home, attend classes at Samford University, shop in stores, prepare meals, participate in medical appointments, work on graphic designs, and do post-college level homework. The ALJ noted that the claimant is currently pursuing a master's degree and is taking two classes at Samford University in human resources and accounting for managers. (R. 20).

Additionally, the ALJ found that claimant's function report indicates details of a wide range of daily activities that collectively establish no greater than a moderate limitation. The ALJ found that the claimant can read; create art and digital designs for others; attend church weekly; spend time with others; go out to dinner; visit others; follow written instructions; finish what he starts; handle changes in routine; and get along with others.  (R. 20).

Furthermore, the ALJ found that the claimant's medical records from NMC show that the claimant has a moderate limitation in understanding, remembering, or applying information; has linear, logical, and future-oriented thought process; has normal orientation despite an anxious and constricted mood and affect; and has good insight and judgment. The ALJ noted further that the claimant's mental status exam from the VA shows that the claimant has a grossly intact recent and remote memory; appropriate fund of knowledge for his education level; sufficient attention and concentration; logical and goal-oriented thought process; and no overt psychosis.  Thus, the

ALJ found that the claimant has a moderate limitation in understanding, remembering, or applying information. (R.20).

The ALJ found that the claimant experienced moderate limitations in interacting with others. The claimant testified that he was anxious, nervous, intolerant of social activity, and had difficulty being around others. But, the ALJ noted that the claimant's function report indicated the claimant could drive, leave home, attend classes at Samford, attend medical appointments, attend church weekly, spend time with others, visit and go out to dinner with others, and get along with others, including authority figures. The ALJ further noted that the claimant's NMC records indicate that the claimant was consistently cooperative, was self-disclosing, had good eye contact, and was appropriately groomed. (R. 20).

The ALJ then found that the claimant experiences moderate difficulty with concentration, persistence, and pace. The ALJ stated that the claimant's ability to drive,  attend classes at Samford, shop in stores, prepare meals, participate in medical appointments, work on graphic designs, and do post-college level homework demonstrates he is only moderately limited. Additionally, the ALJ noted that the claimant's function report indicates a wide range of daily activities that collectively establish no greater than moderate limitations in this area. The ALJ noted the claimant's coping skills include having a social support system, blogging, painting, surfing, hiking, playing video games, and reading scripture. Moreover, the ALJ found that the claimant's mental status exam from the VA showed no greater than moderate limitations in this area. (R. 21).

The ALJ found that the claimant has a mild to moderate limitation for adapting or managing oneself. The ALJ specifically stated that, although the claimant alleges difficulty in

completing activities of daily living, his testimony and the medical records indicate no more than mild to moderate limitations. (R. 21).

Because the claimant's mental impairments did not meet a severity listing, the ALJ next determined the claimant's RFC. The ALJ determined that the claimant has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(b), such that the claimant could occasionally stoop and crouch, could not climb or drive, could have occasional contact with the general public, coworkers, and supervisors; could not perform work requiring him to meet production goals or quotas. (R. 21-22.)

To support this finding, the ALJ stated that he considered the claimant's medical and non-medical records. The ALJ recounted the claimant's medical record in detail and concluded that, although the claimant's medically determinable impairments could be reasonably expected to cause the complained of symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects were not consistent with the evidence.

Regarding the claimant's ulcerative colitis, the ALJ noted that the medical evidence does not support the frequency, degree, or intensity of daily bathroom breaks asserted by the claimant. The ALJ acknowledged the claimant's allegations of having multiple ulcerative colitis flare ups, with abdominal pain, bloody stools, weight loss and multiple trips to the bathroom.  But the ALJ stated that, although the claimant testified that he uses the restroom 20 times a day, earlier medical records show that "he reported having 2 bowel movements daily in December 2016, 1 to 2 daily bowel movements in June 2017, and 1 to 3 daily movements, when seen in May 2018," which was allegedly during his March through August 2018 flareup.  The ALJ noted that the claimant did report "having 10 to 15 daily bowel movements during his flare up in August [2018], but this appears to be the exceptions, rather than the rule, according to the objective,

26

clinical records."  The ALJ noted that the claimant has been "relatively stable on his treatment and did not have any flare up from June 2016 to March 2018.  Additionally, the ALJ noted the claimant's most recent medical records in May 2018 indicate that the claimant was stable on his treatment with one to three bowel movements a day until August 2018.  (R. 25).

Regarding his back pain, the ALJ recounted all of the medical evidence in the record, including the September 2018 MRI that showed degenerative changes at L2-L3 resulting in moderate spinal canal stenosis and mild right neural foramen stenosis; degenerative changes at L5-L6 resulting in moderate spinal canal stenosis and mild to moderate bilateral neural foramen stenosis; degenerative changes at additional levels; and presence of 5 lumbar type vertebrae and one transitional vertebra labeled as L6.  But the ALJ pointed to examination findings where the claimant had no tenderness or spasms in his back, "normal extremities," "grossly intact cranial nerves," a normal gait, intact sensation, and normal strength.  The ALJ concluded that "examination findings throughout the records are basically normal, demonstrating only mild degenerative disc disease" and no "motor strength or neurological abnormalities."  The ALJ concluded that his RFC assessment was consistent with the medical findings and the overall evidence in the record. (R. 22-26).

The ALJ gave some weight to the opinions of Dr. Timothy Honigman and Dr. Krishna Reddy because their findings support the claimant's limitation during the examination. However, although both opinions concluded that the claimant should avoid concentrated exposure to extreme heat and cold and should avoid all exposure to unprotected heights and hazardous machinery, the ALJ noted that examination findings do not support these conclusions. (R. 26).

Next, the ALJ gave minimal weight to Dr. Robert Clanton's opinion that the claimant may have difficulty with more complex, multi-step instructions. The ALJ found that the claimant's

numerous activities of daily living indicate otherwise. Additionally, the ALJ afforded little weight to Dr. Robert Clanton and Dr. Robert Estock's opinion that the claimant could have casual contact with the public; could receive feedback from coworkers and supervisors as long as it was tactful, non-confrontational, and supportive; and could adapt to infrequent, well-explained changes. The ALJ found that these limitations were vague and fell outside the parameters covered by the Dictionary of Occupational Titles and other vocation guidelines. Moreover, the ALJ found their conclusions inconsistent with other mental status examinations that show the claimant has fair attention and concentration; has grossly intact recent and remote memory; has appropriate fund of knowledge for his education level; has sufficient attention and concentration as well as logical and goal directed thought process; and has no overt psychosis. The ALJ also noted again that the facts that the claimant can work on graphic design as a "side job" and continue his studies at Samford University in pursuit of a Master's degree show that he has moderate limitations in his mental functioning. (R. 27).

The ALJ then considered the hearing testimony from Kelly Coumes, the claimant's wife. The ALJ afforded no weight to the claimant's wife as she is not medically trained. The ALJ noted her opinions were only casual observations, not based on objective medical evidence, and were biased because of family loyalties and secondary financial gain. Additionally, the ALJ found Mrs. Coumes' testimony is inconsistent with objective medical records because examination findings show that the claimant had a normal gait; intact sensation; normal strength; had grossly intact cranial nerves; improved mental functioning; and no current ulcerative colitis flare-up on treatment.

Finally, the ALJ found that the claimant was unable to perform any of his past relevant work based on the vocational expert's testimony. In light of all of the evidence, the ALJ concluded that

28

the claimant could make a successful adjustment to unskilled, medium to sedentary exertional level work that exists in significant numbers in the national economy, such as work as a cardboard box maker, dishwasher, and floral stems tier. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 28-29).

## V. DISCUSSION

The claimant asserts that the ALJ erred in failing to incorporate in the RFC determination limitations regarding his need for frequent restroom breaks and lack of concentration and attention caused by his ulcerative colitis. This court disagrees and finds that substantial evidence supports the ALJ's RFC finding that did not included these limitations.

To support his RFC determination, the ALJ discussed the medical record at length and in great detail, stating that he considered all symptoms and the extent to which these symptoms are consistent with objective medical and non-medical evidence. The ALJ specifically addressed the claimant's allegation that his ulcerative colitis caused him to need restroom breaks 20 times a day, but the ALJ stated that he found that allegation lacked support in the record. The ALJ noted that the claimant reported that he had only two daily bowel movements in December 2016; one to two daily bowel movements in June 2017; and one to three daily bowel movements in May 2018, which was in the middle of one of the claimant's flare ups from March to September 2018. Even during his testimony at the hearing, the claimant indicated that prior to September 2018, he needed 20 restroom breaks daily; but as the ALJ noted, the medical records from December 2016, June 2017, and May 2018 show otherwise.

The ALJ acknowledged the August 2018 medical records that showed the claimant had an ulcerative colitis flare requiring hospitalization and reported symptoms including 10 to 15 bowel movements a day. But the ALJ noted that large number of daily bathroom breaks was the

exception rather than the rule, and pointed to records from May 2018, which was in the middle of the claimant's second flare up, where the claimant stated he only had one to three daily bowel movements.  The ALJ also noted that at the hearing the claimant's ulcerative colitis was in clinical remission and stable on his treatment.  As support for not including any limitations in his RFC assessment for frequent restroom breaks, the ALJ also noted that, since the claimant's alleged onset date of disability on May 2, 2016, the claimant had only one flare up with his ulcerative colitis two years later in August 2018. So, the ALJ gave specific reasons for not including the need for excessive bathroom breaks in his RFC assessment and substantial evidence supports those reasons.

The claimant also argues that the ALJ should have included limitations in the RFC assessment regarding the claimant's inability to concentrate because of his ulcerative colitis.  But the ALJ specifically addressed this issue and adequately explained that the claimant's ability to attend classes at Samford University in the MBA program, complete homework for that class, and create graphic designs for others shows that he has adequate concentration and attention to work.  The ALJ also pointed to medical records from the VA that showed that the claimant had sufficient attention and concentration.  So, the court finds that substantial evidence supports the ALJ's determination to not include additional specific limitations regarding his attention and concentration in his RFC assessment for the claimant.

Along these same lines, the claimant also suggests that the ALJ's hypothetical to the VE on which the ALJ based his RFC finding and his finding that other work in the national economy exists that the claimant can perform lack substantial evidence because that hypothetical did not include any limitations regarding his frequent bathroom breaks or inability to concentrate.  But an ALJ is not required to include limitations or impairments unsupported by substantial evidence

in the hypothetical posed to the vocational expert. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004).  The ALJ did include many limitations in the many hypotheticals he presented to the VE.  But the ALJ adequately explained why he did not include all of those limitations in his ultimate RFC assessment, and the court finds that substantial evidence supports the ALJ's decision on this issue.

And although the ALJ found that the claimant had "moderate limitations" in concentration, persistence, and pace at step two, he did not have to include that limitation in his RFC assessment where he considered those limitations "alongside the rest of the evidence" and concluded that the claimant had the ability to perform unskilled work despite his concentration deficits.  *See Smith v. Comm'r of Soc. Sec.,* 486 F. App'x 874, 876 (11th Cir. 2012 (unpublished) (noting the ALJ's acknowledgement that moderate limitations in concentration, persistence, and pace were found at step two but not included in the RFC and finding no error where such limitations were "considered alongside the rest of the evidence").  The ALJ considered the claimant's moderate limitations in concentration, persistence, and pace alongside all of the other evidence and made the decision to not include those limitations in his RFC assessment and substantial evidence supports the ALJ's decision.

The court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.  In this case, the ALJ thoroughly recounted all of the medical and non-medical evidence in the record and specifically explained his reasons for not including limitations in his RFC assessment regarding frequent bathroom breaks and inability to concentrate.  And the claimant's conditions

were stable at the time of the hearing.  The court cannot reverse the ALJ simply because it may have reached a different conclusion.  The ALJ's first hypothetical question to the VE, which mirrored the ALJ's RFC finding, appropriately included all of the claimant's limitations that the ALJ found were supported by substantial evidence in the record and the ALJ committed no reversible error.

The court finds that the ALJ adequately considered the medical record as a whole in making his RFC determination, including the claimant's alleged symptoms regarding frequent restroom breaks and inability to concentrate, and that substantial evidence supports the ALJ's RFC assessment for the claimant that did not include these limitations.[4]

## CONCLUSION

For the foregoing reasons, the court concludes that the ALJ applied the proper legal standards, substantial evidence supports his decision, and the decision of the Commissioner should to be AFFIRMED.

The court will enter a separate Order to that effect.

DONE and ORDERED this 21st day of October, 2020.

_Karon O. Bowdre_

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE

---

[4] In a footnote, the claimant attempted to argue that he did not effectively waive his right to counsel at the hearing because he was not properly apprised of his options concerning representation. *See Smith v. Schweiker*, 677 F.2d 826, 828 (11th Cir. 1982). Accordingly, the claimant contends the ALJ had an enhanced duty to develop the record in this case at the hearing and should have posed additional hypotheticals regarding employer tolerances for being away from the workstation. This court does not agree. The Social Security Administration notified the claimant prior to the hearing about his right to be represented by counsel. Additionally, the claimant appeared at the ALJ hearing without counsel and waived his right. In fact, the claimant was apprised of his options concerning representation twice and waived this right twice. (R. 119, 38-39). And the ALJ thoroughly developed the record at the hearing.  The court notes that the claimant is represented by counsel on this appeal.